STATE OF MAINE                                UNIFIED CRIMINAL DOCKET
PENOBSCOT, ss.                                LOCATION: BANGOR
                                              DOCKET NO. CR-16-4438

STATE OF MAINE,                   )
                                  )
        Plaintiff,                )
                                  )
        v.                        )       **ORDER ON MOTION TO SUPPRESS**
                                  )
MICHAEL RICHARDS,                 )
                                  )
        Defendant.                )

The Defendant, Michael Richards, is charged in a three-count indictment with the offenses of Possession of Sexually Explicit Materials (Class C) and Possession of Sexually Explicit Materials (Class D). Mr. Richards, through his counsel, Hunter J. Tzovarras, Esq., filed a Motion to Suppress, dated March 23, 2017. The motion seeks "to suppress the search of the computers taken from [the Defendant's] home on April 12, 2012," on the grounds that "Mr. Richards never gave consent to search his computers." Hearing was held on the Defendant's Motion on May 15, 2017.[1] At the hearing, the State of Maine was represented by Assistant District Attorney Suzanne Russell, Esq.. The Defendant was represented by Attorney Tzovarras. The hearing featured extensive testimony from Detective David Armstrong of the Maine State Police. In addition, the parties presented the audiotape of a lengthy interview of Mr. Richards conducted by Detective Armstrong, which occurred in April 2012[2] and took place at Mr. Richards' apartment. The audiotape, which runs to nearly an hour in length, consists almost exclusively of a discussion between Detective Armstrong and Mr. Richards. It was identified as State's Exhibit 5, and was admitted without objection. The audiotape was played to completion during the May 15 hearing, and the court has since reviewed it carefully to confirm both the details and the context of Detective Armstrong's

---

[1] At the conclusion of the hearing, the parties requested, and were given, the opportunity to present written closing arguments. The State's deadline was identified for written argument was established as June 16, 2017. The Defendant's deadline was set at June 30, 2017. Defense counsel made the reasonable request to have his deadline extended, in a motion filed July 3, 2017 and granted (after the fact) July 19, 2017.

[2] The Defendant's Motion identifies the precise date of the interview and subsequent seizure as April 12, 2012. The Evidence Receipt and Evidence Control Sheet submitted as State's Exhibits 6 and 7, respectively, identify the date of the seizure as April 4, 2012. Detective Armstrong's testimony at the May 15 (2017) hearing did not identify a specific date. As best the court can tell, the audiotape of the interview between Detective Armstrong and Mr. Richards does not identify the exact date of the interview.

PJC BANGOR COURTS
JUL 25 '17 AM10:04

1

interactions with Mr. Richards. Based upon the audiotape, and as set forth more fully below, the court disagrees with the Defendant's assertion that he did not consent to the removal and search of his computers. The court therefore denies the Defendant's Motion to Suppress.

## FINDINGS OF FACT

Detective Armstrong testified that he has been employed by the Maine State Police for 32 years, the last 17 of which have béen as a detective. His "primary responsibility" is "child pornography investigation." Detective Armstrong explained the technical process through which computers "share information through downloaded programs," which "creates a direct connection from one person's computer to another." In many "early" child pornography investigations, the program most frequently used to connect computers was "Limewire." More recently, there are "many programs" upon which consumers of child pornography rely. Detective Armstrong further explained the mechanics of investigations of this nature, and characterized his work as "proactive," rather than "referral-based." Detective Armstrong testified to the process through which individual images were located, through the creation of "digital fingerprints" that directed his attention to "specific files of interest." He ultimately identified 32 images and, although he did not view every one of them, he personally viewed four and identified two as containing images of child pornography. Detective Armstrong conceded that he is "an investigator and not a forensic analyst." The court does not believe this distinction compromises the foundation upon which Detective Armstrong approached Mr. Richards on April 12, 2012.

More generally, the court found Detective Armstrong to be a credible witness. He exhibited candor, was responsive to the questions he was asked both by the State and by defense counsel, and did not appear to be exaggerating or overreaching in his testimony. Detective Armstrong did not attempt to evade or quibble with questions he faced on cross-examination. In particular, he agreed under cross-examination that he "could have obtained a search warrant" but "chose not to." He explained that the reason for this was that it was necessary first to determine whether the occupant of the physical address at which the computers were located corresponded to the individual identified by the internet service provider as maintaining the account that generated the electronic fingerprints. This is particularly true in the case of the multi-unit apartment

2

dwellings of the type involved in this investigation.  Detective Armstrong also acknowledged that he used an "improvised consent form" to "inventory" the computers taken from Mr. Richards that was not in fact the form typically used when such property is seized.  Detective Armstrong agreed with defense counsel that the "improvised consent form" was "somewhat careless attention to detail and preparation" on his part and further agreed that "it would have looked better if I had" the proper form.  However, the court finds that the existence of consent is a separate question from that of the form upon which the consent was expressed.  As noted, much of the court's reasoning relies upon the substance of the audiotaped interview.

### The Audiotaped Interview

Based upon its careful review of State's Exhibit 5, the court makes the following findings.  On April 12, 2012, Detective Armstrong travelled to the apartment complex at which Mr. Richards then resided.  Upon arrival, he encountered Mr. Richards in the "stairwell" of the complex, and immediately identified himself as a State Police detective.  He then asked for, and received, Mr. Richards' permission to enter his apartment, and waited in the "entryway" while a home health aide who provided Mr. Richards with regular assistance vacated the premises.  Detective Armstrong advised Mr. Richards that he was "investigating illegal activity in the area," and that his "investigation led him to this apartment."  Detective Armstrong did not provide a specific explanation of the investigation, and instead asked Mr. Richards if he knew "why I am here."  Detective Armstrong instructed Mr. Richards not to "play with" the computer at which he was then seated, because "it's part of why I am here."  Detective Armstrong said that he would be honest with Mr. Richards and asked for honesty in return, and then told Mr. Richards, "we did not pick your apartment out of thin air."  Throughout this initial interaction, Detective Armstrong maintained a friendly tone and an almost casual demeanor, telling Mr. Richards at one point that "you might be in trouble, you might not but I want you to feel like you can talk to me in either case."  To this statement, Mr. Richards replied, "I want to cooperate, I don't want to be arrested."  In response, Detective Armstrong stated, "you will not be arrested today—period."

When Detective Armstrong asked whether Mr. Richards knew the reason for his presence, Mr. Richards replied, "it's the child porn, isn't it?"  Mr. Richards then stated, "I have always had issues with this, obviously I have failed to control it."  These statements were made without any particular prompting; they were specific responses

3

to a vaguely phrased question from a State Police detective who had already identified himself as such. Once Mr. Richards acknowledged that he had "issues" with "child porn," he asked "what should I expect here," and repeated his concern about being arrested. Detective Armstrong then asserted for a second time that "you will not be arrested," this time adding to his reassurance that Mr. Richards would only be arrested "if you have a video of a murder or if you have a live child here." These statements are obviously, and intentionally, hyperbolic. They are not deceptive. They strike the court as serving the purpose of refocusing Mr. Richards' attention rather than attempting to extract information from him.

Mr. Richards asked what would "happen next," and Detective Armstrong stated that "our technicians want to look at your computer, make sure you aren't filming here, and see what else is on there." Detective Armstrong then asked "can we do that?", to which Mr. Richards replied "How long will it take?" Detective Armstrong explained that he would "bring the computer out to an analyst" in the parking lot area, who would then "take a look at it while we keep talking." Mr. Richards said again, "I don't know what to expect, I know I have a problem." For a third time, Detective Armstrong then assured Mr. Richards "you will not be arrested," adding that he (Detective Armstrong) would "leave today and go home to Augusta." Detective Armstrong added that Mr. Richards "would probably be charged with something," but that this decision would be "up to the D.A."

This exchange is of particular significance. Throughout, Detective Armstrong was not only not deceptive but notably candid, qualifying his reassurances that Mr. Richards would not be arrested by noting that he would probably be prosecuted. Later in the interview, Mr. Richards asked whether "I will have jail time for this," and Detective Armstrong responded again with candor, stating "I don't know, I won't say 'yes' and I won't dare say 'no.'" He provided a fairly lengthy explanation of the considerations that go into a sentencing analysis, and noted that Mr. Richards—who has physical limitations that require him to use a wheelchair—might not be the subject of a jail request by the prosecutor (Detective Armstrong's precise formulation of this was "you are in a wheelchair, they might not want jail for you, you might pay a fine instead." Detective Armstrong added that Mr. Richards should "get with your counselor" and "work damn hard to show progress" to "make the case against jail," but concluded—again candidly, and a bit bluntly—"kids are getting abused to put this stuff

4

out there, so it is hard for me to say there will be no jail time." Mr. Richards then observed that "my mother always warned me this would happen," explaining that "she caught me once."

Having established the purpose and the parameters of the investigation, the interview turned next to the issue of consent to search the computers. In fact, Detective Armstrong said specifically to Mr. Richards "I want your consent to take the computer to the lab to do a full forensic." Detective Armstrong added that "if your answer is 'no,' I won't take" the computer. In response, Mr. Richards said "I don't want to be uncooperative," and asked "what will happen?" Detective Armstrong replied "I have to seize the computer, it has porn on it, I can't leave it here with illegal stuff on it." Detective Armstrong added that "I could get a search warrant," and Mr. Richards said again "I am not trying to be uncooperative here." Detective Armstrong then asked Mr. Richards if he wished to "sign a consent form," and Mr. Richards answered "Sure." Detective Armstrong then cautioned Mr. Richards that "you don't have to sign it, I will get a search warrant if I have to, but I am going to have to take the computer today" in either case "because of the porn on it." Mr. Richards asked "what happens if I don't give consent. At that point, Detective Armstrong stated, in a matter-of-fact tone, that "I am not trying to influence you one way or the other," and explained that he would seek a search warrant if consent were not forthcoming (it was at this point that Detective Armstrong added the further explanation that he would need to take the computer with him in either case because of the presence on it of the illegal material). Mr. Richards then agreed again to sign the proffered "consent form," and Detective Armstrong left the apartment to retrieve a form from his vehicle.

Upon his return to the apartment, there was discussion of a second computer, referred to as a "broken laptop," which Mr. Richards explained was "not working" and which Detective Armstrong asked to take as well. That machine was ultimately included in the "consent form" that was completed and, at the hearing, admitted into evidence as State's Exhibit 7. There was also a "thumb drive" identified and seized. That item was the subject of minimal discussion, but Mr. Richards was quite clear in indicating no concern about having it included in the items seized by Detective Armstrong. The form used by Detective Armstrong is captioned "Maine State Police Computer Crimes Unit," and identified specifically as an "Evidence Control Sheet." It bears a "Case #" (12-096), and is dated "4-4-12." Mr. Richards' signature appears next

5

to an "X" indicator, along with a second, hand-written date of "4/4/12." Detective Armstrong explained his view of the "consent form" to Mr. Richards, stating "I have asked for consent and you've given it to me." Detective Armstrong then stated "I know why you didn't want to" earlier, adding "I will have to think about that later." He then asked Mr. Richards to sign the form. Mr. Richards did so, without further question or comment. There followed some discussion of various hypothetical circumstances, including observation of live sexual activity in the home as opposed to video of sexual activity. Mr. Richards asked about an event that took place earlier in his life, apparently during his early or middle teen years, in the context of explaining that "I have always had issues with this." Detective Armstrong listened to his description of the earlier events, and (apparently) concluded that the events were of no relevance to the immediate investigation.

Several points are relevant here. It is notable, and must be acknowledged, that Detective Armstrong used an improvised consent form to obtain Mr. Richards' signature. He conceded the point in his testimony, and agreed that "it would look better" if he had used the proper form. Under cross-examination, Detective Armstrong further conceded that he had used the proper form "hundreds of times." With that acknowledgment, defense counsel elicited testimony from Detective Armstrong indicating that the proper form includes guidance, including certain specific warnings, about the signatory's constitutional and other legal rights. The form advises signatories that they have the right to refuse consent, and cautions them that information obtained with their consent can be used against them in subsequent prosecutions. However, the court is satisfied, based upon both the content and the tone of the interview itself as presented in the audiotaped interview, that Detective Armstrong provided Mr. Richards with sufficient information concerning his right to refuse consent the steps that would follow if he withheld his consent.

Throughout the interview, Mr. Richards's tone of voice suggested that although he was nervous at times, he was comfortable at others. For most of the interview, he alternated between a tone of resignation and, on occasion, a tone of that was suggestive either of relief or perhaps even optimism that he might now be able to receive assistance in overcoming what for him had been a lengthy "issue" or "problem." The court finds, based upon its review of the audiotape, that Detective Armstrong was neither coercive nor deceptive. He did not obscure or downplay the risk either of prosecution or of

6

incarceration. It is significant to the court that Detective Armstrong was informative and appropriately forthcoming about the possibility of unpleasant consequences prior to eliciting Mr. Richards' consent. In response, Mr. Richards noted that he feared that "this might happen someday." As Detective Armstrong admitted, the improvised consent form was not only inattentive to detail on his part but was "careless." The court finds, however, that this does not undermine the independent existence of consent.

## CONCLUSIONS OF LAW

This case is on somewhat similar ground to that involved in the matter of State v. Bailey, 2010 ME 15, 989 A.2d 716 (*Bailey I*). In that matter, as in this one, the Defendant argued that material located following a seizure of his personal computer should be excluded in the absence of his consent to search the computer. In that case, the Law Court held that the Defendant indicated consent to search his computer even though "he did not utter or write any words of consent;" instead, he undertook certain actions such as "waking up the computer" and by "directing" the police officer to the computer in the first place. *See State v. Bailey*, 2010 ME 15, ¶20, 989 A.2d 716, 722. *See also State v. Cress*, 576 A.2d 1366, 1367 (Me. 1990)(affirming lower court's conclusion that the Defendant consented to a search by assisting and cooperating with law enforcement even though he did not consent to the search in question either orally or in writing). Both *Bailey* and *Cress* are instructive in this case. Neither is ultimately conclusive, however; this case, unlike either of those, actually featured both oral and written indications of consent. *Bailey* also included an analysis of the "deception" undertaken by law enforcement in that investigation, and observed that questions of deception, "as with other factors bearing on voluntariness," are "question[s] of fact based upon the totality of the circumstances." *Bailey I*, 2010 ME 15, ¶24, 989 A.2d at 723-724. That analysis is inapplicable to this case. The court has found that Detective Armstrong was neither deceptive nor coercive, and was in fact notably candid in his interactions with Mr. Richards during the interview that took place. It is true that *Bailey* ultimately found a constitutional infirmity in the scope of the police officer's investigation. The question of scope of consent is not raised in this matter.

Based upon the foregoing, the Defendant's Motion to Suppress the search of the computers seized from his residence in April 2012 is DENIED.

7

Dated: July 21, 2017

_____
JUDGE, MAINE DISTRICT COURT